Mr. Munoz and his wife were traveling by car from Colorado to the wife's aunt's funeral in Kansas City. Highway Patrol Troopers Rule and Ranieri conducted a traffic stop on East The evidence flowing from the stop must be suppressed for two independent reasons. First, Mr. Munoz did not violate any traffic laws, such that the stop was justified from inception. And second, the officers unreasonably extended the stop. The trooper's vehicle had a dashboard camera which recorded the stop in a few minutes beforehand and that was Exhibit 2 to the suppression hearing, and that's in the record here. However, no violation is depicted in that video recording. Next, the troopers unreasonably extended the traffic stop. Mr. Munoz was issued a warning, but he was not informed that he was free to leave. Eventually, Mr. Munoz consented to the search of his whole car. A pistol and suspected fentanyl pills were found. The extension of the traffic stop was neither consensual, nor was it supported by a reasonable suspicion of criminal activity. Next, following his arrest, Mr. Munoz was interviewed at the station. He consented to having his cell phone searched. It was likely a more invasive search than Munoz anticipated. Before we get there, it looks like the license tag violation was pretty cut and dry. Am I missing something on that? You know, I think so, Your Honor. I don't think that it was cut and dry. If we talk about that first alleged violation, the tag violation, the law is clear in Kansas. The Kansas Supreme Court and this court have had lots of opportunities to construe the Statute 8-133. And the law is that the tag has to be visible from a safe following distance. And that's the critical question. The tag's visible from a safe following distance. So we got to think about Trooper Rule and Trooper Ranieri's testimony at the suppression hearing. Rule testified that as he pulled into the highway median heading westbound, he observed Mr. Munoz's vehicle at a perpendicular angle headed eastbound. And the paper tag was sticking straight out and flapping. I don't think so, Your Honor. State versus Juergen Charles from the Kansas Supreme Court, it said there's four things that the statute requires and failure to comply with any one of them is a violation. And the first is that it's securely fastened to the vehicle. And so if it's flapping in the wind, it seems to me it's not securely fastened. And that would be enough under the Kansas Supreme Court's interpretation of this very statute. Your Honor, I respectfully submit that the tag was fastened securely enough here to comply with the statute. And the reason I state that... Well, do you disagree that it was flapping? I disagree. It's not depicted in the Highway Patrol Trooper's dashboard video camera. That's not what the district court found, though. I mean, are you saying it's clearly erroneous what the district court concluded? I believe it is. And I think we have to look at this court's rulings. I think we look at the cases of Edgerton and McSwain. And in those cases, there were some temporary tags that were taped in the rear windows of cars. And this court held that once those traffic stops were initiated and then those officers confirmed that those temporary tags were properly displayed, the stop should have ended there. Right then and there. Those officers should not have even asked for ID. Are you suggesting that even if it was flapping, there was a point in time when the officers could see it because it had quit flapping? Is that enough in your view? Well, when the officers get out of the vehicle and they give pursuit and they find themselves at a safe following distance, there was no flapping. They never observed any flapping once they were behind Mr. Minow's vehicle. And they agreed on that at the suppression hearing. And then we have many minutes of footage from this dashboard camera along the shoulder of the highway there in Kansas. And the wind's blowing. You can hear it through the microphone. You can see the vegetation on the side of the road blowing. And this tag stays right where it's supposed to be. So if it's moving down the highway, so if you're driving down the highway at 60 miles an hour and it's flapping so no one can tell what your license number is, that's not a violation because once you're pulled over for something, it's no longer flapping and you can see it? Your Honor, the tag also wasn't flapping during the pursuit at highway speeds. That's not what the district court found. I mean, the district court found it was, and that's what the officers said. And the officers observed it flapping at either a perpendicular vantage point or traveling in opposite directions, both at highway speeds. And that's not a safe following distance I'd respectfully submit. Well, it's not an issue of whether it's flapping. I mean, it's an issue according to the Kansas Supreme Court of whether it's securely fastened. And, you know, they saw it wasn't. And you can see on the video, he takes on Mr. Munoz to the back of the car and he shows him that the tag is not secure. Right? That's officer rule and he physically lifts the tag. If it were secure, he could, I mean, it wasn't taped down so he could lift it. It was fastened at the top, and I don't know how, and he could lift it. But the video recording shows it staying in place. I do need to make an argument about this element of whether the tag securely fastened versus whether it's visible. In the district court, at the time of the suppression hearing and in the briefing in the district court, the government made the argument that the tag was not clearly visible due to its flapping, and it only became visible once the vehicle came to a stop. This alternative argument of secure fastening, that's being raised for the first time here on appeal. And so with that being raised for the first time on appeal, I would suggest that the court should not consider such an argument. Second, the recording of the trooper's vehicle in pursuit of Mr. Munoz after he was stopped, again, it shows the tag be visible and legible, which confirms that it's secured good enough for statutory purposes. If we want to talk about secure fastening, I would suggest we look at the Lopez Estrada case that's cited by the government in its briefs. That case is very helpful. This court included a photograph of the tag in that case. It was dangling by a wire from the frame of a pickup truck, and that gave a reasonable suspicion that that tag wasn't securely fastened. We're a world apart from Lopez Estrada and the dangling tag in that case. Here we have a tag that's covered in cellophane, and it's affixed by its top to the lift gate of the Jeep where the manufacturer intended it to be mounted. I'd like to move on to the second alleged violation with respect to the fog line violation. First, Mr. Munoz denies traveling outside of his lane, and even if the court finds that he did, this touch of the fog line was the sort of minimal and in-plane breach that would not violate this law. Again, we have to look at the dashboard camera recording, and that recording doesn't appear to show Mr. Munoz ever driving atop or crossing over the highway's fog line. Trooper Rule testified that he couldn't even see in the recording where Mr. Munoz traveled on or crossed the fog line, but he testified he recalled the crossing. He was very clear, and this is helpful to Mr. Munoz, that the Jeep never drifted all the way over the fog line, and this court's found the drifting all the way over the fog line critical, like in that Angeles case. Trooper Annery, he testified somewhat the opposite of Trooper Rule. He could not recall the Jeep ever crossing over the fog line, but he asserted that he could see the violation in the video recording. He said that occurred at a minute 31 seconds into the recording. I'd respectfully request that the panel review that recording. It sounds like you all already have. And even the government takes the position that it can't be seen one way or the other on the video of Mr. Munoz cross the fog line. Let's move to whether they unreasonably extended the traffic stop. Okay. When we have a traffic stop, it only can be extended on two bases after that stop is concluded. One, if Mr. Munoz consented, or two, if the troopers developed a reasonable suspicion criminal activity was afoot. As argued in the opening brief, the extension of the traffic stop, it wasn't consensual. It involved this very controversial Kansas two-step procedure, making it appear that Mr. Munoz consented to further question when, in fact, he didn't. In that case, that Shaw versus Jones case is currently up on appeal in the court. It was a 1983 case. Anyway, the government doesn't defend the extension of the stop as being consensual. It's not defended in this brief. Instead, the government argues that the troopers had developed a reasonable suspicion of criminal activity by the time they issued the warning citation. And I'd submit that that assertion is undercut by the fact that the troopers engaged in this two-step charade to give the interaction the appearance of consent. It was completely unnecessary if the troopers believed they had developed a reasonable suspicion at that time. Well, their subjective thinking is irrelevant, is it not? Their subjective thinking is irrelevant. That's irrelevant. Even if they thought that the consent was not valid, that's irrelevant. The question is whether it was valid. Just similarly, the question is whether there was reasonable suspicion, not whether the officers didn't think there was reasonable suspicion. And I question whether we should say if the law enforcement uses belt and suspenders, which is not unusual to think they have, where they think they have reasonable suspicion, but just to be safe, they'll ask for consent. That should not undermine the claim of reasonable suspicion, should it? I think the officers' actions in this history of this two-step in Kansas, I think it does somewhat undermine the reasonable suspicion. Let's get to the reasonable suspicion analysis. Let's talk about the totality of the circumstances here. These officers run record checks on Mr. Minos. They find out he has no prior drug history, and his criminal history consists of two prior misdemeanor arrests. And then the officers fault Mr. Minos for being physically nervous. His hands were shaking, and he had a nervous voice. But this isn't the extreme nervousness that this court's relied on before. Also, they chalk up to nervousness this unoffended statement that Mr. Minos makes about traveling to the wife's aunt's funeral in Kansas City. But how is that? He doesn't kind of blurt it. I mean, he immediately blurts it out. He does. In response for, I think, can I see your license, he sort of blurts it out. He blurts it out, but anyone who's been stopped by a law enforcement officer fully would expect to be asked, well, what are your plans or where are you headed? He'd beat the officer to ask him the question. The district court and the officers faulted Mr. Minos for giving unspecified travel plans and that they weren't tied up or he didn't know where exactly in Kansas City he'd be arriving. But this is somewhat inconsequential as his travel to Kansas, it may have been unusual that he didn't know what address he was going to, but it wasn't implausible. It was his wife's family member who had passed, and they were on their way to Kansas City. These weren't implausible plans like in other cases where a vehicle stopped 200 miles away from a city that the driver tells officers they just left an hour ago. Also, if we look at other reasonable cases, like maybe this court's decision in the Frazier case, I would submit there's less factors supporting reasonable suspicion here than even in Frazier. In the Frazier case, we had air fresheners, we had evasive responses from the driver, the driver produced two identification cards from different states. That driver was in a rental car traveling cross country, he was unable to produce the rental contract. And even there, this court found that there wasn't an objective reasonable suspicion of criminal activity. How long, how many minutes was this stop prolonged that you found objectionable from its inception? Well, it's my position that there was no reason to stop the car to begin with, but it took about 10 minutes from the beginning of the stop until the warning was issued. After that, it was all extension, and it was all an unreasonable extension. How long was this position? How many minutes? The video is about 22 minutes long, I believe. I may be wrong on that. I think another 12 or 14 minutes go by somewhere in that range. Before the consent was obtained? The consent, there were multiple consents obtained, and I want to answer this question. I see I'm out of time. Initially, the Trooper Rule asked for consent to search the rear hatch area. It's a Jeep Cherokee. And so he searched that, and then as Mr. Munoz and his wife were standing on the side of the road, he says, well, can I search the whole car? And I think it was just a matter of minutes before they requested to search the whole car. And they turned the car inside out, they removed the spare tire, bounced that, searched all through it. It took many, many minutes. Your time's up, and I don't want to extend this much, but you didn't address the Jesus statue, the Jesus Malverde statue. Sure, I'd like to talk about that. Very briefly, very briefly. I'll give you a minute. Sure. There's other reasons than the protection of drug smugglers why someone might have that in their car. Here, there's indication it was for religious observance. The Malverde was displayed next to the Virgin Mary, so it looks like that was a religious symbol. Also, if we look at the Lopez Gutierrez case from this court, that was cited by the government. In that case, there were multiple Malverde images in that car. There were hidden compartments in that car. There was air freshener, and there was not enough luggage for the long trip claimed by the driver. We have much more attenuated circumstances here in the Lopez Gutierrez case. Thank you, Your Honor. I see that I'm out of time. Thank you. Mr. Buckman? May it please the Court, Albert Buckman, on behalf of the United States, I want to talk about the two independent bases for the stop and the extension of that stop. Kansas Statute 8-133 imposes two affirmative duties on drivers. One is to have a secure tag. The second is for that tag to be clearly visible. Here, the troopers stopped. They both testified they saw flapping of that tag to reasonably believe that the tag was not securely fastened. The video does not contradict that finding. The District Court found the troopers credible in that testimony because the camera comes into play during the pursuit several minutes after the observations had taken place. Mr. Jackson said that the securely fastened argument was not preserved below. Would you address that? I think it was argued by the government in their answer to the motion to suppress Volume 1, page 90. The government states affirmatively, Muniz's temporary tag was not securely fastened at the bottom of the plate after quoting the statute. But even if it wasn't fully argued, this Court can affirm on alternative grounds that are supported by the record. Here, that ground is supported by the record. The District Court found the officers credible in the flapping of that tag. And the question isn't whether the violation was occurring, it's whether they reasonably believed that the license was not securely fastened. And they did, and that was the first basis for stopping Mr. Muniz's vehicle. The second basis is whether he drifted outside of his lane, whether drifting on the fog line was sufficient. And again, the District Court found the troopers credible. The dash cam shows what it shows. The District Court found it grainy. It shows gross details. It does not capture fine details, and the troopers testified to as much, that it was older technology. The troopers observed Mr. Munoz drive twice on top of that fog line. If you think about it, going 60 miles an hour, that would have been twice within 15 seconds. Even fewer seconds if he was going faster. With that, State v. Marks from the Kansas Supreme Court, would that be enough? I mean, it relies on the language as nearly as practicable. And here, there's no evidence in the record at all to talk about driving conditions. So, it's hard to evaluate what was practicable. I disagree. There was testimony of what the driving conditions were, and the dash cam also shows those gross details of the driving conditions. Well, the dash cam video, it's not going to win any Oscars. It is what it is. But the trooper rule did testify that it was light winds, 10 to 15 miles an hour, there was no snow or ice, it was a straight road, it was hilly. And the dash cam does show other vehicles maintaining their lane assignments. I don't think the dash cam tells us one way or another. But the district court found the troopers credible on that point. And the district court found that the troopers were credible on that point. I'd like to address the extension of the stop. The troopers were... I agree that I believe the Rodriguez moment was the point behind the vehicle when trooper rule told Mr. Munoz, no ticket, just checking if you're awake and sober, and then continued questioning. That was the point when he needed reasonable suspicion, and I'm not arguing consent in this case. And that reasonable suspicion, that temporary detention, that needed to justify up until the point of consent. The trooper rule relied on four factors, some of these factors kind of mixed together, but it's the Jesus Malverde observation of that pendulum, it's the physical nervousness that trooper rule observed of Mr. Munoz, the unprompted statement, as well as the unspecified travel plans. And looking at the totality of the circumstances here, I think everything needs to be viewed from the lens of that Jesus Malverde pendulum hanging. That informs the totality of the circumstances and why these troopers had reasonable suspicion that drug trafficking was occurring. So trooper rule articulated that this was extreme nervousness. But he provided a basis for that conclusion. He said it was not a normal traffic stop. He testified that Mr. Munoz's hand was shaking as he was handing the paperwork over. And even after he said no ticket before he went into the vehicle to do traffic stops, well, backing up, he said no ticket, left Mr. Munoz in his vehicle to go do the traffic checks, returned, and he stated that Mr. Munoz's voice was still showing nervousness. That shows that this wasn't just nervousness as any normal citizen encounter. It was persistent and it was extreme to the point that it was showing physical manifestations. And trooper rule was thrown off by how Mr. Munoz just launched into a story, not in response to routine and I have your driver's license and registration. Trooper rule testified that this wasn't typical behavior. Most drivers, and this is based on his experience on those roads for 30 years, they typically ask, why did I get stopped? And Mr. Munoz launches right into a story. And trooper rule immediately felt that based on his training experience, which can be considered, that it was an attempt to evoke sympathy, which he had seen many times in his experience with drug traffickers. So that unprompted statement both showed the nervousness, but it also showed trooper rule that this may be an attempt to evade him, to evoke sympathy, and that's all building into this totality of the reasonable suspicion here. And he also found it suspicious, based on his experience with drug traffickers, that Mr. Munoz didn't specify where he was going. Where are you going? To Kansas. They're already in Kansas, he didn't specify the city, and he went so far as to articulate that drug traffickers often don't disclose their location. So some of the factors kind of blend together, but here there was extreme nervousness and trooper rule articulated a more than sufficient basis, and the district court credited that testimony. Should we give any weight to the fact that there was no hanging bag for clothes? I think this court, it's a consideration, and it's something that trooper rule testified to. I'm not saying it's the strongest factor here. I think it's just a consideration in the analysis. Society may have changed. Maybe it is things that some people would do. Maybe some people, when going to a funeral, what trooper rule? Stops cars every day on that highway. He stops people going to funerals, and in his experience, he would expect to see dress clothes, and he testified to all of that. It's a consideration. It's not the biggest factor, but it is a consideration in the overall totality here, and how the story isn't quite making sense to him. And this is all in light of the Jesus-Melbourne Day pendulum that's hanging there. Going to the unspecified destination. Mr. Munoz just launches into that conversation, not in response to anything. Trooper rule, at that point, was surprised, and he testified that he was thrown off. He started conversing about the funeral, and he was trying to do his routine checks. And I already addressed that, that Mr. Munoz said that he was in Kansas and didn't specify location, but he also didn't have a good, clear timing of that funeral. And here, the consideration isn't whether each piece can be explained by innocent behavior. It's whether we can rule out a significant portion of innocent behavior. And here, adding everything together, that was informing trooper rule in light of the circumstances that this may be possible drug trafficking. The Jesus-Melbourne Day pendulum. This court has used that as a factor before in the reasonable suspicion analysis. And both troopers testified that, in their training experience, that this is known as Mr. Melbourne Day is known as the patron saint of drug smuggling. That Mr. Trooper Ranieri testified even further that he had seen roadside seizures with that image being displayed. And while there may be innocent explanations for that, that's not the sole question. And it can be more likely than not that it was innocent, but it's whether, by a totality, it's reasonable for officers to believe that that supplies reasonable suspicion. And here, the officers believed so in light of all the circumstances. So the government does believe that there was ample factors here added together for reasonable suspicion. So I moved a little quickly through my entire argument. I want to go back and address this fog line issue of whether being on the top or whether this was minimal and incidental breaching of that statute. If we agree with you about the license plate, do we need to even reach that? I don't think so. They're both separately independent bases. Affirming on either of those bases validates the traffic stop here. But it was well argued by the defense that whether this is a minimal and incidental breach, and it is a bit of a novel issue of whether driving on top of the fog line is sufficient. So I agree that to supply reasonable suspicion, it must be no more, it must be more than minimal and incidental lane breach, and we will do the two-part fact specific inquiry of assessing the number of crossings, touchings, how far over, the timing of that, as well as the adverse conditions here. And Trooper Rule testified that it was twice on top of that fog line. Even on the dash cam, he advises Mr. Munoz, hey, you were over on top of that fog line. And as I said, it was within a quarter mile. It wasn't within a mile, two miles. It was within a matter of seconds that Mr. Munoz was drifting, driving on top of that fog line. And there's more than ample evidence here. And the district court agreed that the conditions couldn't explain sufficiently that drifting. It was a bright, clear day, and the video shows it as much that it was a bright day. No obstructions, just a normal driving day. In this court, the government submits that that was sufficient. That was more than minimal and incidental lane breach. And the question, another I think somewhat novel question, is whether driving on top of the line or over the line is required here. I relied on two cases, Marks as well as McGregor, to argue that driving on top of the line is sufficient. In Marks, the court says, we interpret the statute as establishing two separate rules of the road. The first requires a driver to keep entitlery within a single lane. That rule is temporarily suspended when it becomes impractical to stay within the lane markers. So they do articulate that the lane is established by the lane markers, not the shoulder of the road. So the government, certainly the court needs to consider whether, how far he traveled, he drifted out of this lane. But there is authority here to support that it's that lane fog line marker itself that establishes the lane. So, I have one minute left. It's the government's position that that securely fastened element of the duty of the license plate statute is an independent statute. It's in the plain language. Lopez Estrada considered only that section of the statute in affirming the reasonable suspicion in that case despite a clearly visible tag. So, that was an independent basis as well as the drifting of Mr. Munoz in that lane. I'm almost out of time. If there's no further question, I ask this court to please affirm. Thank you, counsel. Any questions for the panel? Thank you, gentlemen. The case is submitted. Counsel are excused.